UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| FMC CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:07CV819 |
| ) | GBL/BRP |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY AND STEPHEN ) | |
| L. JOHNSON, ADMINISTRATOR, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| NATURAL RESOURCES DEFENSE ) | |
| COUNCIL, INC, ) | |
| ) | |
| Intervenor. ) | |

BRIEF OF THE AMERICAN BIRD CONSERVANCY
AS *AMICUS CURIAE* IN SUPPORT
OF THE ENVIRONMENTAL PROTECTION AGENCY[1]

The American Bird Conservancy ("ABC") submits this brief to support the positions of the Environmental Protection Agency ("EPA") and the Natural Resources Defense Council ("NRDC") and to make the additional argument that, inasmuch as plaintiff FMC Corporation appears to have abandoned its request for review of the EPA's denial of its rulemaking petition and instead seeks a declaration

---

[1] No party objects to the filing of this brief. We are authorized to state that FMC Corporation takes no position on its filing, that the Environmental Protection Agency does not object to its filing, and that Intervenor Natural Resources Defense consents to its filing.

that 40 C.F.R. § 164.80 violates the Administrative Procedure Act, FMC's pre-enforcement challenge to the regulation is not ripe for decision under *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136 (1967), and other authorities discussed below.

## INTEREST OF THE *AMICUS CURIAE*

The American Bird Conservancy ("ABC") is a not-for-profit organization whose mission is to conserve wild birds and their habitats throughout the Americas. With offices in The Plains, Virginia and Washington, D.C., and staff in Colorado, Missouri, Montana, and Oregon, ABC is the only U.S.-based group dedicated solely to overcoming the greatest threats facing birds in the Western Hemisphere. A growing human population consuming ever greater resources is critically impacting bird populations, through habitat destruction, direct mortality from such harmful practices as the unwise use of pesticides, and the introduction of destructive species. ABC believes adequate resources exist to overcome these threats, and that unifying people, organizations, and agencies around common approaches to priority issues is the key to success.

### ABC's Interest In Pesticides

Of the five billion pounds of pesticides that are applied worldwide each year, 20 percent are used in the United States, according to the EPA.[2] One well known

---

[2] Kiely, T., Donaldson, D., and Grube, A., *Pesticides Industry Sales and Usage: 2000 and 2001 Market Estimates*, U.S. Environmental Protection Agency, Washington, D.C.

estimate suggests that more than 67 million birds die each year as a result of direct exposure to pesticides on U.S. farms alone.[3]

In response to continuing pesticide-related bird kills throughout the Americas, the ABC established the *Pesticides & Birds Campaign* in 1998. The Campaign is supported by a full time staff whose mission is to better define how and to what degree specific pesticides pose risks to birds, and to reduce the exposure of wild birds to hazardous pesticides. The Campaign develops and supports scientific research; seeks to improve regulatory, evaluative, and monitoring frameworks; serves as an information and advocacy hub; and, when necessary, works to cancel registrations of the most dangerous pesticides.

With funding from the EPA and private donors, ABC developed the Avian Incident Monitoring Systems ("AIMS") using documented pesticide incident data from the EPA and other government sources. AIMS provides the most complete database on pesticide exposure incidents to wild birds and is available to the public on the ABC website at http://www.abcbirds.org/aims. The EPA and ABC have recorded more than 2,500 incidents of bird kills – many including thousands of individual birds – attributable to pesticide use.

Avian mortality from direct exposure to pesticides is not the whole story. Repeated exposure to some pesticides can also lead to sub-lethal effects such as decreased breeding success. The best known example involved DDT, which nearly wiped out the Peregrine Falcon and Brown Pelican by thinning the shells of their

---

[3] Pimentel, D., & Acquay, H., *The Environmental and Economic Costs of Pesticide Use*, BioScience 42:750-760 (1992).

eggs to the point where they broke before hatching. The AIMS database documents 113 pesticides, of which about 60 are currently used in the United States, which have caused bird mortalities and die-offs.

**ABC's Interest In The Elimination of Carbofuran**

Carbofuran is an insecticide first registered in the U.S. in 1969. Up to 2.8 million pounds of liquid carbofuran are used each year in the U.S., primarily on corn, alfalfa, rice, potato, sorghum, grapes, sunflowers, and tobacco. In 1989, EPA estimated that 1 to 2 million birds were killed each year by carbofuran.[4] According to both the Ecological Incident Investigation System and the ABC AIMS databases, carbofuran has been responsible for more avian deaths than any other pesticide. Hundreds of bald eagle deaths have been linked to carbofuran, and more than one hundred bird species (including bluebirds, Northern pintails, American robins, owls, swallows, grackles, killdeer, and kestrels) have been documented as having died from carbofuran poisoning. The number of birds involved in any single incident ranges from one to 20,303. http://www.abcbirds.org/aims.

On June 24, 2005, as part of its duty to reregister pesticides registered before 1984, *see* 7 U.S.C. § 136a-1, the EPA announced the availability of its "Environmental Risk Assessment" for carbofuran and opened an official public docket soliciting comments. *See* Carbofuran Risk Assessment; Notice of Availability, 70 Fed. Reg. 36586 (June 24, 2005). The Environmental Risk

---

[4] U.S. EPA Office of Pesticides and Toxic Substances, *Carbofuran: A special review technical support document*, Washington, D.C. (1989).

4

Assessment itself, dated June 3, 2005,[5] stated that all of the extensive evidence before the Agency "support[s] the conclusion that non-target birds and mammals are being exposed to carbofuran levels that result in direct mortality and that exposure to and mortality of non-target birds and mammals occur frequently with carbofuran registered uses." Environmental Risk Assessment, Executive Summary, p. iii. By way of one example, the Assessment stated that "Flocks of mallard ducks foraging in an alfalfa field (single feeding event) treated at the typical [carbofuran] application rate were estimated to experience on average 92% mortality if they foraged on the field any time between application through at least three days post-application." *Id.* p. iv.

On August 23, 2005, ABC, on its own behalf and on behalf of twenty four other organizations interested in the preservation of birds and/or the discontinuance of harmful pesticides, submitted comments to EPA. ABC stated that, based on the Risk Assessment, "there are NO uses of carbofuran that are safe for populations of wild birds"; noted "that 96% of the corn producers [in the U.S.] are using alternatives to carbofuran"; and urged EPA to disallow reregistration of all uses of the pesticide.[6]

The US Fish and Wildlife Service, which since 1991 has urged the EPA to cancel the registration of carbofuran, also submitted a comment, repeating its

---

[5] Document 6 in the EPA Docket EPA-HQ-OPP-2005-0162, available at www.regulations.gov.

[6] Document 8 in Docket EPA-HQ-OPP-2005-0162.

request for cancellation and stating that "there are no known uses of carbofuran that do not pose a risk of mortality to wildlife."[7]

FMC took full opportunity to submit comments of its own. Indeed, EPA Docket EPA-HQ-OPP-2005-0162 shows that between February 10, 2006 and October 24, 2007, FMC submitted some 49 separate studies, responses to EPA studies, or other comments.

On August 30, 2006, the EPA released its Interim Reregistration Eligibility Decision ("IRED"),[8] in which it set out its carbofuran Risk Assessment and, on the basis of that assessment, concluded (at p. 29) "that all products containing carbofuran are not eligible for reregistration."

## ARGUMENT

The briefs of the EPA and NRDC make compelling arguments:

– that EPA is not the proponent of an order in a pesticide registration cancellation proceeding; rather, the manufacturer is the proponent of an order rescinding the EPA's notice of proposed cancellation;

– that in any case the EPA is not the proponent of a cancellation order that arises as a result of a reregistration proceeding, where the manufacturer is the proponent of reregistration under the same criteria that applies in an original registration proceeding;

– that, even if the EPA *is* the proponent of a cancellation order, the APA imposes the burden of persuasion on the proponent "unless otherwise provided by

---

[7] Document 19 in EPA Docket EPA-HQ-OPP-2005-0162, available at www.regulations.gov
[8] Document 8 in Docket EPA-HQ-OPP-2005-0162.

statute," and FIFRA's overall structure and legislative history shows that it does indeed "otherwise provide" that the pesticide manufacturer bears the burden in all matters pertaining to registration, reregistration, and cancellation;

– that the latter conclusion is supported by the incorporation of APA procedures in FIFRA's suspension provision (7 U.S.C. § 136d(c)(2)), but not in its cancellation provision (7 U.S.C. § 136d(b)); and

– that extensive case law unanimously supports the conclusion that the manufacturer bears a continuing burden at *all* stages under FIFRA,[9] and that, assuming that EPA is the proponent, FIFRA "otherwise provides" that the manufacturer bears the burden of persuasion.[10]

To these persuasive showings we add only two points.

## I. FMC's Position Is Contrary To The Public Interest

FMC's position is contrary to the public interest and ascribes to Congress a purpose charitably described as perverse. Carbofuran was first registered in 1969,

---

[9] *EDF v. EPA*, 548 F.2d 998, 1018 (D.C. Cir. 1977) ("[W]e find that in a suspension hearing * * * the burden of persuasion rests ultimately on the registrant"); *Southern National Mfg. Co. v. EPA*, 470 F.2d 194, 196 (8th Cir. 1973) ("In a registration cancellation under FIFRA, the burden is on the respondent to show that his product is safe."); *Dow Chemical Co. v. Ruckelshaus*, 477 F.2d 1317, 1324 (8th Cir. 1973) ("the registrant has a continuing burden of proof to establish that its product is entitled to registration"); *Continental Chemiste Corp. v. Ruckelshaus*, 461 F.2d 331, 335 (7th Cir. 1972) ("In cancellation proceedings, as in applications for initial registration, the manufacturer has the burden of proving that his product is not 'misbranded' within the meaning of the Act"); *EDF v. EPA*, 465 F.2d 528, 532 (D.C. Cir. 1972) ("The burden of establishing the safety of a product requisite for compliance with the labeling requirements, remains *at all times* on the applicant and registrant.") (emphasis added); *Stearns Electric Paste Co.*, 461 F.2d at 293, 305 n.39 (7th Cir. 1972) ("[W]e read FIFRA itself as requiring that the burden of proof be on the registrant whether in a proceeding for initial registration or in a cancellation proceeding").

[10] *EDF v. EPA*, 548 F.2d at 1013 ("[T]his case is one where the location of the burden of proof is, in the language of the APA, 'otherwise provided by statute.'"); *Stearns Electric Paste Co.*, 461 F.2d at 305 n.39 ("Even if the Administrator is the 'proponent' of a cancellation order, the location of this burden is 'otherwise provided by statute.'").

7

almost 40 years ago. In the intervening years FMC and the EPA have accumulated substantial real-world information about its effect on humans and the environment. That information has been painstakingly collected and presented during the ongoing reregistration proceeding. Now that EPA has been able to study decades of actual experience with a pesticide and has concluded on the basis of that experience that its adverse effects preclude reregistration, there can be no plausible reason why Congress would want to make it *harder* to get the pesticide off the market than it was 40 years ago to bar its initial entry. Put differently, FMC asks the Court to conclude that Congress preferred the commercial interests of a pesticide manufacturer to the health and well being of the populace and the environment. That cynical, unsupported view deserves to be rejected.

## II. FMC's Pre-Enforcement Challenge To § 164.80 Is Not Ripe

While the EPA has shown that FMC's challenge to 40 C.F.R. § 164.80 comes too late, we believe that it, in the alternative, it comes too early.

FMC's Complaint sought review of the EPA's denial of its rulemaking petition (see ¶ 6), and for relief asked for a declaration that the denial violated the APA and an order compelling the EPA to initiate a rulemaking. Complaint, pp. 14-15. But "a refusal [to engage in rulemaking] is to be overturned 'only in the rarest and most compelling of circumstances.'" *American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) (citation omitted); *see also Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993) (characterizing "the scope of judicial review of a refusal to engage in rulemaking"

as "[e]xtremely narrow review," which frequently has the same "practical effect" as "no review at all").

Presumably because of that extremely narrow review, FMC's Motion pointedly does *not* seek review of the EPA's denial of its rulemaking petition, and for relief instead requests a declaratory judgment that § 164.80(b) violates the APA.

FMC's abandonment of its request for review of the EPA's denial of its rulemaking petition means that FMC is mounting a pre-enforcement challenge to the regulation. But that challenge is not ripe, because § 164.80 has not yet been applied to FMC and, under two scenarios, it may cause FMC no harm when and if it ever is applied. First, if the EPA does issue a cancellation notice and FMC requests a hearing, at the conclusion of that hearing the Administrative Law Judge may rule that FMC has borne its burden and deny cancellation of the registration. In that case, not having been aggrieved by the regulation, FMC would have no standing to contest its application.[11] Second, the ALJ might rule in favor of cancellation but hold that, because the Agency's proof of adverse effects was so great, FMC would have lost even if the burden had been imposed on the Agency. If the latter holding were upheld on appeal, FMC again would not be aggrieved by § 164.80 and thus would have no standing to challenge it. Alternatively, FMC might suffer the harm it fears – a ruling that cancellation was appropriate *because* Petitioner bore but failed to meet its burden. But at this point that harm is only speculative. In these

---

[11] A ruling in FMC's favor would deprive FMC of both Article III standing, which requires a showing of injury in fact, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and any right of review under the APA, which is restricted to persons "aggrieved" by agency action. 5 U.S.C. § 702.

circumstances, where a plaintiff cannot demonstrate that some substantial hardship will result from the Court declining to hear its case, a pre-enforcement challenge to an agency regulation is not ripe for review.

The ripeness doctrine requires inquiry into "the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 149 (1967). The fitness of the issue for judicial decision depends in part on "the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Regional Management Corp., Inc. v. Legal Services Corp.*, 186 F.3d 457, 465 (4th Cir. 1999) (inner quotation omitted). As for hardship, pre-enforcement review is appropriate "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Abbott Laboratories,* 387 U.S. at 152. *See also National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003) (absent a statutory provision providing for immediate judicial review, "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review * * * until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.") (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990)); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967) (pre-enforcement review allowed where the regulations "are self-executing, and have an immediate and substantial impact").

The Fourth Circuit applied these principles in *Regional Management Corp., supra,* in rejecting a plaintiff's challenge to a FOIA-related policy of the Legal Services Corporation. The plaintiff did not have a FOIA request pending. The court ruled that plaintiff's claim was nonjusticiable because the court's interest in avoiding unnecessary adjudication was strong and the challenged policy had no "direct and immediate" effect on the plaintiff that would cause hardship from delay. 186 F.3d at 465; *see also Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d 240, 244 (4th Cir. 1977) (finding the claim ripe, in part, because the company "must take immediate steps to comply with the policy;" for example, the "company must undertake construction work itself, negotiate contracts of indemnity, or take other precautionary measures.").

Here the EPA regulation has neither immediate nor substantial impact on FMC's business. It "does not command anyone to do anything or refrain from doing anything; it does not grant, withhold, or modify any formal legal license, power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations." *National Park Hospitality Ass'n,* 538 U.S. at 809. The regulation "does not affect any primary conduct." *Id.* at 810. And, as we have seen, whether the regulation will ever adversely affect FMC "depends upon multiple contingencies." *Regional Management Corporation,* 186 F.2d at 466. Hence here as well the Court's interest in unnecessary adjudication is strong.

In short, FMC's effort to avoid the vanishingly narrow review standards for the denials of rulemaking petitions has led it down a dead end – to a pre-

enforcement challenge to an agency regulation that it not ripe for review and therefore is nonjusticiable.

## CONCLUSION

The EPA's motion for summary judgment should be granted; FMC's motion for judgment on the pleadings should be denied.

Respectfully submitted,

\_\_/s/_____

| | |
|---|---|
| Of counsel: | Brooke E. McDonough<br>(VSB No. 65724)<br>Counsel for American Bird Conservancy |
| William F. Sheehan<br>John Townsend Rich<br>Eric Hager<br>Goodwin Procter LLP | Goodwin Procter LLP<br>901 New York Avenue, N.W.<br>Washington, D.C. 20001<br>(202) 346-4000<br>(202) 346-4444 (fax)<br>bmcdonough@goodwinprocter.com |
| November 1, 2007 | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2007, I filed electronically the foregoing Brief of the American Bird Conservancy as *Amicus Curiae* with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

>Abid R. Qureshi, Esquire
>Latham & Watkins LLP
>555 Eleventh St., NW, Suite 1000
>Washington, DC 20004-1304
>abid.qureshi@lw.com
>*Counsel for plaintiff*
>
>Ralph Andrew Price Jr.
>Assistant U.S. Attorney
>Office of the U.S. Attorney
>Justin W. Williams U.S. Attorney's Building
>2100 Jamieson Avenue
>Alexandria, Virginia 22314
>andrew.price@usdoj.gov
>*Counsel for defendants*
>
>John Francis Mardula, Esquire
>Roberts Abokhair & Mardula LLC
>11800 Sunrise Valley Dr, Suite 1000
>Reston, VA 20191-5317
>Mardula@globe-IP.com
>*Counsel for intervenor*


>By:   /s/
>      Brooke E. McDonough
>      Goodwin Procter LLP
>      901 New York Avenue, N.W.
>      Washington, D.C. 20001
>      (202) 346-4000
>      (202) 346-4444 (fax)
>      bmcdonough@goodwinprocter.com

LIBW/1660537.1